UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DIANE MOORE | : | CIVIL ACTION NO.: |
| | : | 301CV1018 (WWE) |
| Plaintiff | : | |
| | : | |
| V. | : | |
| | : | |
| CAPITAL REGION WORKFORCE | : | |
| DEVELOPMENT BOARD AND | : | |
| FRANCIS J. CHIARAMONTE, | : | |
| IN HIS OFFICIAL AND | : | |
| INDIVIDUAL CAPACITY | : | |
| | : | |
| Defendants | : | JULY 8, 2004 |

### Defendants' MEMORANDUM OF LAW IN Support of tHEIR Motion FoR Summary Judgment

Preliminary Statement

Defendants submit this memorandum of law in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff seeks monetary damages and alleges that Defendants' creation and maintenance of a hostile and abusive work environment, harassment, and termination of her employment with Defendant Capital Region Workforce Development Board ("CRWDB") was the result of intentional discrimination on the basis of race, color, sex

and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §2000e, the Civil Rights Act of 1991, and 42 U.S.C. §1983.

On or about July 24, 2000, Plaintiff Diane Moore filed a discrimination complaint with the State of Connecticut Commission on Human Rights and Opportunities and the United States Equal Employment Opportunity Commission.  On or about April 12, 2001, Plaintiff received a Notice of Right to Sue from said Commission, and subsequently filed a complaint with this Court on June 5, 2001 and an amended complaint on July 27, 2001 naming CRWDB and its Executive Director, Francis J. Chiaramonte, as defendants.  Defendants filed an answer to the amended complaint, the parties have conducted written discovery and the Defendants took the deposition of the Plaintiff on December 23, 2003.

Plaintiff has not and cannot offer any direct, indirect, circumstantial or statistical evidence upon which a reasonable jury could conclude that she was harassed or terminated by CRWDB because of her race, color and/or gender or in retaliation for her claims thereof.  Defendant has articulated legitimate, nondiscriminatory reasons why it terminated Plaintiff, which include Plaintiff's inability to work well with others, acts of insubordination and non-compliance with company policies, Plaintiff's poor work attitude and poor work performance.  Pursuant to the relevant standards established by

the U.S. Supreme Court and the Courts of the Second Circuit, Defendants are entitled to summary judgment in their favor against Plaintiff on the entire Complaint.

I.  Statement of Facts

CRWDB is a Connecticut private non-stock corporation with its principal office located in Hartford, Connecticut.  (Amend. Complaint ¶ 5).  Plaintiff, Diane Moore, was employed by CRWDB at the Hartford facility as a full time administrative assistant from August 15, 1994 until March 31, 2000.  On March 31, 2000, Plaintiff was terminated for failure to perform her job duties in a manner acceptable for an employee of the CRWDB. (Amend. Complaint ¶ 12).  On June 5, 2001, Plaintiff filed suit against CRWDB alleging that she was intentionally discriminated against by CRWDB and its Executive Director, Francis J. Chiaramonte, on the basis of race, color, sex and retaliation, in the terms and conditions of her employment; the creation and maintenance of a hostile and abusive work environment; harassment and termination. (Amend. Complaint ¶ 1).  Plaintiff focuses her allegations on two particular incidents which occurred during her employment. (Amend. Complaint ¶ 13).

The first of these incidents occurred on February 2, 2000 (Amend. Complaint ¶ 13), and involved a verbal altercation between Plaintiff and Ted Hale, a co-worker who had worked with Plaintiff for approximately four years.  Mr. Hale held the position of

Director of Finance for CRWDB (Hale Affidavit ¶3), and as a result interacted with the Plaintiff concerning financial matters of the organization.  When asked in her deposition if she shared any common interests with Mr. Hale outside of the work environment, Plaintiff responded that "[w]e got along fairly well.  We did trade CDs at times. And I even framed a picture for him that he had taken in Hawaii or somewhere." (Depo. of Diane Moore ("Depo.") p.59 ln. 24-25; p. 60 ln. 1).  At work on the morning of February 2, 2000, Plaintiff and Mr. Hale had a discussion concerning the validation of parking tickets for office visitors who would be attending meetings with Joan Sieverts, whose employer leased space in the same office suite as CRWDB.  Plaintiff had previously been instructed to validate parking tickets for these visitors, and although it was not CRWDB's procedure for Plaintiff to receive written authorization before validating visitors' parking tickets, Plaintiff acted on her own in requiring Mr. Hale to issue a written authorization to her before she would validate the visitors' parking tickets later that morning. (Depo. p. 18 ln. 15-18, 25; p. 19 ln. 1-5).

Plaintiff claims that Mr. Hale responded to her directive for written authorization by stating that "I'm not giving you a fucking thing.  Just because you don't like the bitch [Joan Sieverts], I'm not going to do all this shit. If you want a memo, go to Frank [Chiaramonte].  He's the one who authorized parking [for Business

for Downtown Hartford] in the first place." (Amend. Complaint ¶ 18, Depo. p. 20 ln. 18-21).   On or about February 4, 2000, Plaintiff filed a complaint regarding this incident directly with members of the CRWDB Board of Directors rather than with her immediate supervisor.  (Chairamonte Affidavit Exhibit Q, §1; Depo. P.11 ln.13-15). On February 8, 2000, Defendant Frank Chiaramonte arranged a meeting to discuss the complaint made by Plaintiff against Mr. Hale.  (Depo. p. 20 at ln. 25, Chiaramonte Affidavit ¶ 13).  At this meeting, Mr. Hale apologized to Plaintiff for his inappropriate behavior, and Mr. Chiaramonte issued a written reprimand which was placed in Mr. Hale's personnel file.  (Chiaramonte Affidavit ¶ 14).  Plaintiff was not satisfied with the manner in which Mr. Hale was disciplined and expressed that he should have been "fired." (Depo. p. 22 ln. 22).

The second incident that Plaintiff relies on as evidence of discriminatory behavior occurred on or about February 22, 2000.  At her desk that morning, Plaintiff received a Hartford Police Department poster/flyer warning office tenants that an individual had been making unauthorized entries to various offices in the downtown Hartford area.  (Plaintiff's Resp. to Interrogatory 12, Depo. p. 39 at ln. 5-7).  Wendy Tortomas, Plaintiff's immediate supervisor, also became aware of the poster and instructed Plaintiff to deny access to that individual and call security immediately

should he attempt to enter the office at the reception area where Plaintiff was located. (Plaintiff's Resp. to Interrogatory 12).  Plaintiff's workstation was located just inside the entrance to the CRWDB offices and in the reception area. (Plaintiff's Resp. to Interrogatory 14)  Accordingly, Plaintiff was the first person that people would interact with when they entered the office.  (Depo. p.41 ln. 1-2, 15-18).

Plaintiff claims she was given the poster/flyer at the office because, as an African American, she would be able to identify the African American suspect depicted in the poster.  (Plaintiff's Resp. to Interrogatory 16).  Additionally, Plaintiff alleged that Ms. Tortomas' requirement that she identify the individual depicted in the flyer would constitute "racial profiling" because the quality of the poster's photograph was "dark" (Depo. p. 45 ln. 5-6), and it would therefore be impossible to positively identify the individual.  Plaintiff additionally claims that the instructions from Ms. Tortomas signified that Plaintiff, as an African American, "was expected to protect everybody else while all the white people ran behind the door."  (Depo. p. 43 ln. 6-8).

Plaintiff's job duties included, but were not limited to, answering incoming telephone calls and forwarding calls to appropriate staff or their voicemail. (Chiaramonte affidavit ¶ 7).  Plaintiff further served as a receptionist for the CRWDB headquarters by greeting visitors, providing information to visitors, and directing

visitors to offices or conference rooms, as appropriate. (Id.).  In order to perform the above-mentioned duties, Plaintiff was required to generally remain at her desk during regular business hours, except for lunch or other authorized breaks, and when it was essential to be away from her desk for specific tasks. (Id.). Processing outgoing mail expeditiously and distributing incoming mail were also Plaintiff's responsibilities, as well as maintaining computerized mailing and phone lists for all Board and Committee members. (Id.).  Lastly, Plaintiff was responsible for providing back-up support to other administrative assistants. (Id.).  These assignments were to be performed accurately, timely and with good quality. (Id.).

II. Argument

     A.    Standard of Review for Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, this Court should grant summary judgment when "there is no genuine issue as to any material fact…and the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In cases where the movant is the defendant, the defendant must demonstrate that the nonmoving party, the plaintiff, lacks evidence to support an essential element of his/her claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The movant's

burden is "discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. *Id.* at 325. The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).

To grant a motion for summary judgment in favor of the defendant, the Court does not need to find that there is literally no evidence in favor of the plaintiff. *Id.* at 251. Rather, "[t]he judge's inquiry…unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party…upon whom the onus of proof is imposed.' " *Id.* at 252 (quoting *Schulkill and Dauphin Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)).

The ultimate question of fact in an employment discrimination case is "not whether the plaintiff established a prima facie case or demonstrated pretext, but 'whether the defendant has discriminated against plaintiff'." *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983).

       B.     <u>Plaintiff Cannot Make Out a Prima Facie Case of Employment Discrimination.</u>

Plaintiff is alleging disparate treatment, harassment and retaliation due to her race, color and gender. In the absence of direct evidence, the tripartite analysis of the order, allocation, and standard of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies in individual disparate treatment Title VII cases. The plaintiff bears the burden of proving both a prima facie case of employment discrimination and of rebutting any legitimate nondiscriminatory explanation proffered by the employer. *Accord*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).

According to the requirements set forth in the *McDonnell Douglas* formula for establishing a prima facie case of discrimination, Plaintiff must demonstrate that:

1. She was a member of a protected class;
2. She was qualified for her position;
3. She was subject to an adverse employment decision; and
4. There is direct or circumstantial evidence from which the finder of fact might reasonably conclude that the employer intended to discriminate in reaching the decision at issue. *McDonnell Douglas Corp.,* 411 U.S. at 802, *Sherrod v. Sears, Roebuck &.Co.*, 785 F.2d 1312, 1314 (5th Cir.1986).

Plaintiff has not put forth sufficient evidence to satisfy the fourth element of a prima facie case as outlined in *McDonnell Douglas and Sherrod*. Although Plaintiff has alleged two specific incidents of discrimination in her Amended Complaint (Amend. Complaint ¶ 13, 21), she has not provided direct or circumstantial evidence from which a reasonable finder of fact could conclude that the Defendants intended to discriminate in reaching the decision to terminate her. Defendants' lack of intent to discriminate towards Plaintiff is further supported on account that Defendant Chiaramonte was responsible for both decisions to hire and terminate Plaintiff. (Evans v. Technologies Applications & Service, Co., 80 F.3d 954. 959 (4th Cir. 1996); Chiaramonte Affidavit ¶ 4,5,16). Furthermore, at the time of Plaintiff's discharge, the composition of Defendant's workforce included 27.5% African Americans (Hale Affidavit ¶ 6 ), whereas, according to the Connecticut Census for 2000, the percentage of African Americans in the greater Hartford area, the general job market for CRWDB employees, was only 11.6%. http://www.ct.gov/ecd/LIB/ecd/2000census/2000_census_Profile_DP-1.xls. Both of these factors weigh heavily against any inference that either Defendants intended to discriminate against the Plaintiff on account of her race.

Plaintiff asserts that Ms. Joan Cusano was a similarly situated employee and was treated differently than Plaintiff by their Supervisors, thus demonstrating Defendants' discriminatory behavior toward her. However, an inference of discrimination can be defeated by evaluating the circumstances surrounding Ms. Cusano's employment. Ms. Cusano was a part time worker while Plaintiff was employed full time. (Depo. p. 48, ln. 12, Tortomas Affidavit ¶ 18). As such, Ms. Cusano was only required to act as the receptionist while Plaintiff was away from her desk, at lunch, or on breaks. (Id.). At the time of Plaintiff's termination, Ms. Cusano had only been employed part time at CRWDB for two years, compared to Plaintiff's six year full time tenure. Due to her status as a part time employee, Ms. Cusano was subject to different expectations than Plaintiff. (Id.). Furthermore, Ms. Cusano's work performance was satisfactory while employed at CRWDB. (Tortomas Affidavit ¶ 19). Unlike Plaintiff, no formal complaints were made against Ms. Cusano by co-workers or members of co-tenant organizations. (Id.). Accordingly, all of these circumstances surrounding Ms. Cusano's employment, when taken together, do not give rise to an inference of discrimination.

Additionally, Plaintiff claims that in the incident of February 2, 2000, Ted Hale acted in a discriminatory and harassing manner toward her. However, when describing Mr. Hale's character, Plaintiff stated he was similar to a "little boy who needed his

behind whipped," and she claimed that "he just need[ed] to grow up a little bit." (Depo. p.111 ln.18). Furthermore, Plaintiff and Mr. Hale had known each other for several years by the time of this incident and they shared common interests together. Given Plaintiff's own opinion of Mr. Hale's character, it is more likely that Mr. Hale's behavior, while certainly inappropriate and immature, was not done in a discriminatory or harassing manner toward the Plaintiff. Behaving immaturely is not behaving with racial or gender animus.

Despite Plaintiff's claim that Defendant Chiaramonte acted discriminatorily in disregarding her concerns, Plaintiff's confrontation with Mr. Hale was addressed in a February 8th meeting Defendant Chiaramonte arranged where all parties to the conflict were present and disciplinary measures were taken. Mr. Chiaramonte reprimanded Mr. Hale and required him to apologize to Plaintiff for his inappropriate behavior. Additionally, Mr. Chiaramonte placed a written reprimand in Mr. Hale's personnel file. (Chiaramonte Affidavit ¶ 14). Therefore, no reasonable finder of fact could infer that Mr. Hale's behavior, nor Defendant's response thereto, was discriminatory or made in order to maintain a hostile or abusive work environment toward Plaintiff.

The second alleged discriminatory and harassing incident that Plaintiff alleges involves the distribution of a Hartford Police Department security alert poster/flyer. Plaintiff claims she was specifically given the poster because she is an African American and the male pictured on the poster was African American. (Plaintiff's Resp. to Interrogatories 16). However, the poster was given to Plaintiff because she was the office receptionist and the first person visitors would encounter when entering the office suite. (Depo. p. 41 ln. 1-18, Tortomas Affidavit ¶ 10). Because the poster would have been given to whomever was responsible for sitting at the reception desk, no matter the individual's race, color or gender, there is no inference of discrimination or harassment logically gleaned from Plaintiff's receipt of the poster. (Tortomas Affidavit ¶ 10).

Furthermore, Plaintiff claims she was discriminated against and harassed, on account of her race and gender, in that she was required to do work for people other than her direct supervisor, Wendy Tortomas. (Depo. p.80 ln. 3-5). However, Plaintiff's job description and her own understanding of the requirements of her position both acknowledge that it was her responsibility to provide support to the other administrative assistants and other CRWDB employees. (Depo. p.78 ln.1-2, Chiaramonte Affidavit ¶ 7). Additionally, Plaintiff stated in her deposition of December 23, 2003 that "[p]art of my job was to help everybody there in the office when needed. My objection was being dumped on by somebody so they could go out and do their personal shopping or conduct personal business." (Depo. p.55 ln.16-20). Plaintiff was required to provide

office support to her co-workers, and she not only testified to this in her deposition multiple times, but her objection to the treatment she received from others made no mention that race was a factor in how they treated her. (Id., Depo. p.80 ln.3-8, p.47 ln. 21-25).  Plaintiff's job duties, as well as her understanding of them, strongly negates any reasonable inference of discrimination or harassment arising from the duties she performed fro other employees.

Finally, Plaintiff's only direct evidence of racial animus was disclosed only in her deposition.  Plaintiff claims that Ms. Carolyn Griswold told her that African Americans are not in management positions "because black people are not supposed to be able to tell white people what to do."  (Depo. p. 16 ln. 1-4).  However, Carloyn Griswold is neither an employee of CRWDB, nor a named defendant in this suit. Additionally, Plaintiff did not make this incident known to Defendant Chiaramonte, nor has she ever claimed that she reported this incident to any employee of CRWDB. Therefore, it is not reasonable to hold Defendant Chiaramonte responsible for failing to address this situation.   Furthermore, given that Ms. Griswold was not an employee of CRWDB, neither the organization nor Defendant Chiaramonte would have had limited ability to address this situation.

C.    Even if Plaintiff can establish a prima facie case, Plaintiff cannot show that Defendant's legitimate reason for termination is a pretext for discrimination or that it was retaliatory.

Whenever a plaintiff succeeds in proving a prima facie case, the burden shifts to

the defendant to articulate a legitimate non-discriminatory reason for the employee's

termination.  *Hicks*, 509 U.S. at 507, *Texas Department of Community Affairs v.*

*Burdine*, 450 U.S. 248, 253 (1981), *McDonnell Douglas*, 411 U.S. at 802.  In a motion

for summary judgment, "the fact that the Plaintiff has established a prima facie case

does not in and of itself foreclose the possibility of summary judgment being granted in

favor of the employer." *Young v. General Foods Corp.*, 840 F.2d 825 at 828 (1988) *cert denied*.

To rebut a prima facie case, the defendant does not have to prove the absence of a discriminatory motive. Rather, its burden is one of production only, and virtually any reasonable articulation of a non-discriminatory justification for termination places the burden back on the plaintiff to show pretext. *Burdine*, 450 U.S. at 257; *accord, Hicks*, 509 U.S. at 508. An employer can meet this burden by introducing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine,* 450 U.S. at 257.

In the instant matter, Defendants documented numerous incidents involving Plaintiff's behavior that substantiate legitimate non-discriminatory reasons for Plaintiff's termination. Plaintiff was terminated for cause because she failed to perform her job duties in a manner acceptable for an employee of the CRWDB. (Chiaramonte Affidavit ¶ 16). More specifically, she was unable to work well with other employees, she committed numerous acts of insubordination, she did not comply with company policies and she exhibited poor attitude and work performance.

1.   Plaintiff was unable to work well with other employees.

During the term of her employment, there were numerous instances of Plaintiff being uncooperative and rude to her fellow co-workers and supervisors. Consequently, several employees made complaints to management concerning Plaintiff's behavior. Ms. Gregoria Goitia ("Gi Gi") complained to Ms. Tortomas about Plaintiff's rude behavior towards her, and Ms. Tortomas documented this complaint on July 30, 1996 in Plaintiff's personnel file. Ms. Goitia specifically complained that Plaintiff continually raised her voice to her and ordered her to answer the phone even though this was Plaintiff's responsibility. (Tortomas Affidavit ¶ 14). On June 10, 1999, another worker in the office suite, Joan Sieverts, complained to Wendy Tortomas and Defendant Chiaramonte about Plaintiff's continually rude behavior toward her, and expressed a desire to avoid interaction with Plaintiff in the future by transferring to another office suite. (Talley Affidavit ¶ 5-6, Tortomas Affidavit ¶ 16).

Another example of Plaintiff's abrasiveness occurred on December 8, 1999 between Plaintiff and Mary Anne Miller, the building security guard. Ms. Miller complained to Defendant Chiaramonte that Plaintiff had confronted her regarding her presence in the office suite and had denied her the use of the office refrigerator. (Chiaramonte Affidavit ¶ 12). However, Ms. Miller had previously sought and received Defendant Chiaramonte's approval to place food items in the refrigerator. Ms. Miller

was upset by Plaintiff's outburst, and Defendant Chiaramonte documented this incident in Plaintiff's personnel file. (Id.)

A further example of Plaintiff's inability to work well with others occurred on March 20, 2000.  Audrey Thompson, the CRWDB Group Executive for Planning and Marketing, had given Plaintiff documents which needed to be placed in an open area in the office suite for public view and dissemination.  (Tortomas Affidavit ¶ 17).  Despite Ms. Thompson's directive, and regardless of her objection, Plaintiff refused to comply and instead placed the documents behind her desk where they were not easily accessible.  Ms. Thompson subsequently composed a written complaint regarding Plaintiff's uncooperative and obstructionist behavior which was placed in Plaintiff's personnel file by Ms. Tortomas. Id.

2.  Plaintiff was insubordinate and failed to follow company procedures.

As evidence of Defendants' legitimate non-discriminatory reasons for termination, Defendants set forth multiple instances of Plaintiff's insubordination and failure to follow company procedures.  The first of these incidents occurred in March of 1996 and is documented in Plaintiff's personnel file.  The incident involved a request by Mr. Rick Gibilisco, the Director of Administration, for Plaintiff to inquire as to the identity of telephone callers before transferring them to his voicemail.  As Ms.

Tortomas documented in Plaintiff's personnel file, Plaintiff refused Mr. Gibilisco's request in a very defensive and uncooperative manner. (Tortomas Affidavit ¶ 13). This incident illustrates Plaintiff's insubordinate behavior.

Plaintiff also failed to follow company procedures. For example, when she was hired, Plaintiff chose to work from 8:00 am to 4:30 pm with two fifteen minute breaks and a half hour period for lunch. (Chiaramonte Affidavit ¶ 8). On October 28, 1996, Defendant Chiaramonte documented in Plaintiff's personnel file that she frequently disregarded this schedule and took thirty minute breaks and one to one and one half hour lunch breaks. (Chiaramonte Affidavit ¶ 9).

Plaintiff was again insubordinate on December 8, 1998 when Ms. Tortomas instructed her to type revised lists of the CRWDB Board of Director's Committee members. Ms. Tortomas clearly conveyed to Plaintiff that this task needed to be completed in a timely manner so as to have the lists for a meeting the following day. Rather than comply with Ms. Tortomas' request, Plaintiff took an extended lunch break. As documented in Plaintiff's personnel file, when Ms. Tortomas approached Plaintiff regarding the lists, Plaintiff stated "I know you need the lists for tomorrow's meeting, but just because you're in a rush for something does not mean I'm going to be in a

rush." (Tortomas Affidavit ¶ 3). Plaintiff's response to her supervisor's instruction was clearly insubordinate.

An additional instance of Plaintiff's insubordination occurred on February 23, 2000. On that date, Ms. Tortomas gave Plaintiff a copy of a police poster and asked Plaintiff to call security should the man depicted on the poster enter the CRWDB office suite. As documented in her personnel file, Plaintiff shouted at Ms. Tortomas and refused to follow the security measure. (Tortomas Affidavit ¶ 8). Plaintiff's refusal to follow directives regarding simple yet important security measures was insubordinate.

Plaintiff, on more than one occasion, committed additional acts of insubordination and disregarded the organization's chain of command when she complained directly to CRWDB Board of Director's members rather than to her supervisors. (Chiaramonte Affidavit ¶ 17, 18). The first incident occurred on February 23, 1998 when Plaintiff made a complaint directly to Mr. Michael Doyle, the Chairperson of the CRWDB Board of Directors. Defendant Chiaramonte informed Plaintiff that this behavior was an unacceptable disregard of the organization's chain of command. He further instructed her to follow company policy by initially filing complaints with her direct supervisor or with him. This incident was documented in Plaintiff's personnel file. (Chiaramonte Affidavit ¶ 17). Despite this directive, on or

about February 4, 2000, Plaintiff again superceded the chain of command by filing a complaint directly with two members of the Board rather than with her immediate supervisor or with Mr. Chiaramonte.  (Chiaramonte Affidavit ¶ 18).  These acts of insubordination became pertinent factors in Mr. Chiaramonte's decision to place Plaintiff on probation on March 2, 2000.

### 3.   Plaintiff exhibited poor work performance and poor attitude.

Numerous instances of Plaintiff's poor work performance and attitude were documented in her personnel file.  These observations demonstrate Plaintiff's inability and/or unwillingness to perform her job duties in an acceptable manner.

On April 13, 1998 Plaintiff demonstrated her poor work attitude in a conversation with a job applicant of the Connecticut Bar Foundation ("CBF"), which was a co-tenant of the office space with CRWDB.  When this individual entered the office suite for an interview, Plaintiff attempted to dissuade her from working for the CBF and encouraged her to consider applying for work with the Growth Council instead.  Plaintiff then spoke derogatorily of Liz Drummond, who was the Executive Assistant to the CBF Director.  After the incident occurred, the job applicant wrote a letter which detailed Plaintiff's inappropriate behavior toward her.  Mr. Chiaramonte

informed Plaintiff that this was inappropriate behavior that reflected poorly on CRWDB and placed the letter in Plaintiff's personnel file. (Chiaramonte Affidavit ¶ 10).

An incident providing further evidence of Plaintiff's poor work performance and attitude occurred on January 18, 2000. On that date, Wendy Tortomas documented in Plaintiff's personnel file that she observed Plaintiff reading a magazine at her desk for 45 minutes. She further documented that Plaintiff "threw aside" an assignment Ms. Tortomas had given her, and continued reading her magazine. (Tortomas Affidavit ¶ 4).

Plaintiff's poor work performance continued despite multiple warnings. On January 24, 2000, Ms. Tortomas gave Plaintiff a typing task which was estimated to take no more than one hour to complete. The task needed to be completed for a meeting at 4:00 p.m. the next day. Plaintiff failed to meet the deadline and Ms. Tortomas documented the incident in Plaintiff's personnel file. (Id.). Furthermore, on January 29, 2000, Ms. Tortomas gave Plaintiff two names of individuals that needed to be added to the Executive Committee member list. It took Plaintiff two weeks to add the two names to the list. (Tortomas Affidavit ¶ 6). Ms. Tortomas documented this instance of poor work performance in Plaintiff's personnel file. An additional instance of Plaintiff's poor work performance occurred on March 28, 2000. As documented in

Plaintiff's personnel file, at 10:00 a.m. on that day, Ms. Tortomas gave Plaintiff a mailing task that needed to be completed for the 12:00 p.m. mail pick-up in order to meet a deadline.  At 11:45 a.m., Ms. Tortomas noticed that Plaintiff had not posted the mailing and completed the task.  Ms. Tortomas then assigned the task to another employee, who was unable to complete the posting for the 12:00 p.m. pick-up. (Tortomas Affidavit ¶ 12).  The deadline was not met, which further evidences Plaintiff's poor work performance and its impact on CRWDB's operations.

Because Defendant has introduced sufficient evidence to rebut a prima facie case of race, color, and/or gender discrimination, the *McDonnell Douglas* framework and its presumptions drop out of the case.  *Hicks*, 509 U.S. at 511.  Plaintiff now has the burden of demonstrating that the proffered reason for Plaintiff's termination was not the true reason for Defendants' decision but was instead a pretext for discrimination. *Id*. at 516.  *Burdine*, 450 U.S. at 256.  To meet this standard, Plaintiff is required to produce direct, indirect, or circumstantial evidence that her race and/or color was the determining factor in the Defendants' decision to terminate her, and but for this factor, she would not have been terminated.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 134-136 (2000). Plaintiff has not and cannot produce such evidence.

At this stage of the proceeding, the Court is faced with the ultimate question of discrimination vel non.  In the context of this Motion, Plaintiff must show that there is a genuine issue of material fact that should be resolved at trial by presenting evidence such that a reasonable jury could find in her favor on the question of pretext.  *Reeves,* 530 U.S. at 136.  In order to meet this burden, Plaintiff must produce evidence on which a reasonable jury could (1) disbelieve "all other reasons [for the challenged action] suggested, no matter how vaguely, in the record," *Hicks*, 509 U.S. at 523; and (2) conclude that the protected trait "had a determinative influence on" the employer's decision.  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).  Plaintiff, throughout her pleadings and deposition responses, has failed to address or negate the numerous documented complaints concerning her job performance.  She has also failed to prove that her race, color or gender were even remotely related to the Defendants' decision to terminate her.

A Plaintiff, when faced with a motion for summary judgment, cannot rely on attenuated possibilities that a jury would infer discrimination.  On the contrary, Plaintiff must present "significantly probative" evidence on the issue to avoid summary judgment.  *Anderson*, 477 U.S. at 249-250.  Plaintiff has not done so here.

III.     <u>Conclusion</u>

Plaintiff has not offered any significant probative evidence that the proffered reasons Defendant has elicited for terminating her were put forth as a pretext for discrimination.  Plaintiff has also not offered any direct, indirect or circumstantial evidence to meet her ultimate burden of proving that she was discriminated against by the Defendants because of her race.  Defendants have articulated legitimate, nondiscriminatory reasons why they terminated Plaintiff.  Because Plaintiff has not and cannot establish that these reasons were a pretext for discrimination, Plaintiff has failed to meet her burden on an essential element of her claim under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991 and 42 U.S.C. §1983 and accordingly the Court should enter summary judgment in the Defendant's favor and against Plaintiff on the entire Complaint.

DEFENDANTS,
CAPITAL REGION WORKFORCE
DEVELOPMENT BOARD, INC. AND
FRANCIS J. CHIARAMONTE

By: _____
       Thompson G. Page
       Federal Bar No. ct 11665
       Attorney for Defendants

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the foregoing Memorandum of Law in Support of Defendants' Motion for Summary Judgment was mailed, postage prepaid, this 8th day of July, 2004 to the following:

Cynthia Jennings, Esq.
The Barrister Law Group
211 State Street
Bridgeport, CT 06604

_____
Thompson G. Page