UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **DIANE MOORE** | : | **CIVIL ACTION NO.** |
| *Plaintiff* | : | **301CV1018(WWE)** |
| | : | |
| v. | : | |
| | : | |
| | : | |
| **CAPITAL REGION WORKFORCE** | : | |
| **DEVELOPMENT BOARD** | : | |
| **AND FRANCIS J. CHIARAONTE,** | : | |
| **IN HIS OFFICIAL AND INDIVIDUAL** | : | |
| **CAPACITY** | : | |
| *Defendants,* | : | **November 1, 2004** |

## PLAINTIFF'S RESPONSE LOCAL RULE 56(a) 2 STATEMENT

1. Admit.
2. Deny .
3. Deny.
4. Deny.
5. Deny.
6. Deny.
7. Admit.
8. Deny.
9. Admit.
10. Admit.
11. Deny.
12. Deny.

13. Deny.

14. Deny.

15. Admit

16. Admit.

## DISPUTED ISSUES OF MATERIAL FACT

1. Admit.

2. Deny. Plaintiff was hired as a full-time administrative assistant in August, 1994 at $25,000 and performed the duties of an executive assistant. (Exhibit 1) The policy of the Capital Region Workforce Development Board was to "promote within when it finds, within its discretion, that current employees are the most qualified for a particular position. (Exhibit 2) Plaintiff received a "4" on her Performance Evaluation Form, "4" meaning that Plaintiff frequently exceeded expectations and it identified Plaintiff's quality of work and performance as, "highly effective and successful completion of objective measures and subjective factors that are required to effectively achieve job goals. (Exhibit 3) Nevertheless, Plaintiff was discriminated against as noted by Wendy Thomas being hired one year later to fill an Executive Assistant position. To further discriminate against Plaintiff, Defendants hired Amy Holmes, a Caucasian woman, in February of 1998 and gave her a salary of almost $3,000.00 more than Plaintiff. (Exhibit 4)

3. Deny. Plaintiff was hired as an Administrative Assistant on August 15, 1994. CRWD's Position Description for Administrative Assistants lists as one of the responsibilities, "Provides **back-up support** for other Administrative Assistants and Receptionist as number "7" in the priority realm of principal responsibilities. Plaintiff was not to be the receptionist but to provide back up for the receptionist. (Exhibit 5) Plaintiff's duties as an Administrative Assistant included answering the telephone, which was noted in her 1995-1996 Performance Evaluation Form. Plaintiff received a "4" on her Performance Evaluation Form, "4" meaning that Plaintiff frequently exceeded expectations and it identified Plaintiff's quality of work and performance as, "highly effective and successful completion of objective measures and subjective factors that are required to effectively achieve job goals. (Exhibit 3) However, Plaintiff aspired to further her career and applied for the Executive Assistant position. (Exhibit 1) When it became evident that Defendants' were not using Plaintiff to fulfill her job responsibilities as an Administrative assistant, Plaintiff complained to Chiaramonte. (Exhibit 23) At this time, Plaintiff began to experience discrimination. Plaintiff was demoted to a receptionist position without discussion or acceptance, and further, no other similarly situated white person working as an Administrative Assistant was treated in this manner. (Exhibit 6) Plaintiff was being used as a receptionist and Defendants further discriminated against Plaintiff by allowing **four** other agencies to use Plaintiff as a receptionist without monetary restitution.

(Exhibit 7) White managers and employees of other plaintiff was required to work for without pay, plus the security guard not only supervised plaintiff, they lodged complaints against plaintiff that were retained in her personnel file for as far back as 1998. These complaints against plaintiff from White individuals outside of the CRWDB, her employer, were used to assist in justifying plaintiff's discriminatory termination (Exhibit 25 p. 4 # 6;  p. 5 # 10 and p. 6 # 13) Defendant Frank Chiaramonte further discriminates against Plaintiff by referring to her as a receptionist, and by allowing plaintiff to be worked and supervised by those individuals outside of the agency. (Exhibit 8; Exhibit 25 p. 4 # 6;  p. 5 # 10 and p. 6 # 13)

4. Deny.  Up and until 1998, Plaintiff received more than satisfactory performance evaluations from Defendant (Exhibit 9) From that point forward, Plaintiff was discriminated against as she did not receive timely performance evaluations. (Exhibit 10)  Plaintiff notified Frank Chiaramonte both verbally and in writing, relative to the requirement in the personnel manual that "an evaluation will be made at least once annually."  Plaintiff complained about not being evaluated in accordance with the Personnel Policies of the organization, and a memorandum was sent to Frank Chiaramonte on January 27, 1998, and February 3, 1998.  The terms and conditions of plaintiff's employment were seriously impacted because of the failure of Frank Chiaramonte to follow the Personnel Policies as they related to plaintiff.  This failure to evaluate in a timely manner, allowed plaintiff's employment rights and civil rights to be violated.  This arbitrary enforcement of the personnel

policies, also translates into discriminatory enforcement of the policies. Further, plaintiff filed a complaint with Frank Chiaramonte about the fact that other Administrative Assistants were being hired at a higher salary than plaintiffs. Plaintiff also inquired as to "What happened to the Personnel Committee that was supposed to be formed by the Board to address staffing and salary issues?" Plaintiff requested that the Executive Committee look into the issues relative to staffing in this correspondence. (Exhibit 11)

5. Deny. Ted Hale's behavior towards Plaintiff was not just a verbal confrontation. Ted Hale became physical, in that he not only engaged in profanities, including "I don't have to give you a fucking thing. Just because you don't like the bitch, I'm not going to do all this shit," Plaintiff also states that Ted Hale went on and on and was throwing things on the floor and yelling." This outrageous conduct occurred on or about February 2, 2000. (Exhibit 12 and Exhibit 13)

6. Deny. Ted Hale reportedly engaged in screaming and swearing at plaintiff, and also engaged in physical activities, including throwing things on the floor and yelling. (Exhibit 12 and Exhibit 13). "Frank Chiaramonte denies blaming Ms. Moore for Mr. Hales conduct, but he did hold Ms. Moore **partially responsible** for the situation between the two of them." (Exhibit 14)

7. Admit.

8. Deny. The purpose of the meeting was in effect to put plaintiff on notice that she had better look for another job. (Exhibit 15). "After the meeting regarding [plaintiff's] meeting regarding her complaint against Ted, Frank Chiaramonte did not speak to Plaintiff for two weeks. (Exhibit 15) When Frank Chiaramonte finally did speak to Plaintiff, he advised her to "look for another job." (See Exhibit 15) Plaintiff's contends that if Ted Hale were black and she was white, she would have been fired on the spot. (Exhibit 16) Ted Hale was not discriminated against. Ted Hale was given a reprimand and was not terminated for his inappropriate, unprofessional discriminatory actions against Plaintiff. In fact, Ted Hale's behavior was considered an "isolated situation" and no further action was necessary. Also, the memo regarding the discrimination against Plaintiff was removed from Ted Hale's file in six months. (Exhibit 17)

9. Admit.

10. Admit.

11. Deny. As noted in Plaintiff's performance reviews, there is no question as to whether the Plaintiff was qualified to do the job of a receptionist/administrative assistant. (Exhibit 3 and 9) This point is moot as it

does not address the fact that plaintiff did not apply, interview or accept any offer to be a receptionist/administrative assistant. At the time of hiring Plaintiff in 1994, there was no such position as receptionist/ administrative assistant. (Exhibit 5) Plaintiff made it very clear that she was looking to advance her career with CRWDB and specifically asked for a promotion to the position of Executive Assistant. (Exhibit 4)

12. Deny. Plaintiff claims that the Hartford Police Department Security Alert Poster was put on her desk in 1999, not 2000. Further, Plaintiff states that she was the only one to receive a copy of the Hartford Police Department Security alert poster of an African-American male who had been known to gain unauthorized access to business offices in the Hartford area. Plaintiff claims that Joan Sieverts handed the poster to her about seven-thirty in the morning, and plaintiff told her "I wouldn't recognize him if I saw him. Further, Joan Sieverts told her "Well, he's incarcerated now, but he's due to get out ion about six weeks." Plaintiff claimed that the copy she had was very, very dark. She could not even discern his features. Claimant believes she got the flyer twice in 1999 and once in February 2000. (Exhibit 26 p. 32-40) Wendy Tortomas instructed plaintiff to stop this man if he came into the office and call police or security. (Exhibit 26 p. 43-44) Plaintiff states that that was not the only time she was given instructions relative to providing security for the agency. She stated that "…on another occasion an employee was terminated, and I was instructed by Wendy that if she comes in here, don't let her get back

there to see Frank." (Exhibit 26 p. 44) Plaintiff further states that no one else was told about the flyer. Plaintiff checked all the mail slots, and there were no flyers in anyone else's mail slots other than my own. (Exhibit 26 p. 45) Plaintiff further stated that "…any mail that came in there that pertained to black organizations or black people was given to her. (Exhibit 26 p. 46). Plaintiff stated that if the mail was not addressed to anybody in particular, she put the mail into Frank Chiaramonte mail slot. Eventually it would end up in my mail slot, if it pertained to black agencies. (Exhibit 26 p. 46)

13. Deny. When Plaintiff was given the "poster" she was instructed by her supervisor to "hold" the known criminal and not let him gain entry to the business. When the Plaintiff objected to this, Defendant, through its acting agent, Wendy Tortomas, stated that Plaintiff's response was inappropriate and that "the person posted on this flyer could have been a potential threat to the safety and well being of CRWDB employees. (Exhibit 18) Plaintiff was discriminate against as "she" was perceived to be no threat and would be the person to "hold" the criminal, "deny access and call security" regarding the criminal, thus putting her life in danger for the benefit of CRWDB employees. (Exhibit 19) Plaintiff did not receive any assistance when it came to security issues. She was ignored. (Exhibit 20)

14. Deny. Plaintiff, was hired as an administrative assistant was placed in the position where receptionist sat. (Exhibit 21) Normally, as an Administrative

Assistant, plaintiff would not have been sitting in the reception area to greet guests from four different agencies. Defendant discriminated against plaintiff by altering the terms and conditions of her employment, without her knowledge, or consent, termed her position as being "hybrid" in the sense that Plaintiff was now to act as a receptionist/administrative assistant. Plaintiff was not monetarily compensated for this transition, and plaintiff was not hired as a receptionist. (Exhibit 22)

15. Deny. Although Plaintiff on numerous occasions complained about the hostile work environment and the unfair treatment by others, Plaintiff was denied due process and put on written warning with possible termination in thirty days. (Exhibit 23) However, on March 31, 2000, the decision to terminate Plaintiff was made by Frank Chiaramonte. This was before her 30 day probationary period was over. (Exhibit 24)

16. Admit.

                            The Plaintiff,
                            Diane Moore


By: _____
     Cynthia R. Jennings
     THE BARRISTER LAW GROUP
     211 State Street
     Bridgeport, CT 06604
     Federal Bar No: Ct 21797

# **CERTIFICATION**

      I hereby certify that a true and correct copy of the foregoing Plaintiff's Local Rule 56(a) 2 Statement and Disputed Issues of Material Facts was mailed by U. S. mail on November 1, 2004, to the following attorney of record:

Thompson G. Page
942 Main Street
Hartford, CT 06103.

      By_____
         Cynthia R. Jennings