UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **DIANE MOORE** | : | **CIVIL ACTION NO**.: |
| | : | 301CV1018 (WWE) |
| *Plaintiff* | : | |
| | : | |
| V. | : | |
| | : | |
| **CAPITAL REGION WORKFORCE** | : | |
| **DEVELOPMENT BOARD AND** | : | |
| **FRANCIS J. CHIARAMONTE**, | : | |
| IN HIS OFFICIAL AND | : | |
| INDIVIDUAL CAPACITY | : | |
| | : | |
| *Defendants* | : | **November 1, 2004** |

**PLAINTIFF'S MEMORANDUM  IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

The plaintiff has suffered a great indignity at the hands of the defendants.  The lack of

respect and recognition for exercising one's rights for violation of state and federal laws

is further indication of the disdain and disregard the defendants had for the plaintiff's civil

rights.  This is an action for violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C.A. Section 2000e, [which prohibits employment discrimination based

on race, color religion, sex or national origin] and the Civil Rights Act of 1991 [which provides monetary damages in cases of intentional employment discrimination], and 42 U.S.C. section 1983.  Plaintiff was intentionally discriminated against by Capitol Region Workforce Development Board and its agent Frank Chiaramonte, on the basis of race, color, gender and retaliation, in the terms and conditions of her employment; the creation and maintenance of a hostile and abusive work environment; harassment and termination.

I.    **STATEMENT OF FACTS**

The plaintiff, Diane Moore, is an African-American woman and a member of a protected class. (Amend. Complaint ¶ 9)  Plaintiff's employment relationship as an Administrative Assistant with defendant began in January 1994 and became full-time on August 15, 1994. (Amend. Complaint ¶ 3a) On or about March 31, 2000, Defendant terminated Plaintiff's employment.  The reason given for plaintiff's termination was "failure to perform her job duties in a manner acceptable for an employee of the Capitol Region Workforce Development Board." (Amend. Complaint ¶ 12)  After the plaintiff received this position, she began to experience racial discrimination from her white managers and supervisors; Frank Chiaramonte, Executive Director CRWDB and Wendy Tortomas.  Defendant has for the past six years of plaintiff's employment, failed to address plaintiff's ongoing  complaints of

discrimination and different treatment.  (Amend. Complaint ¶ 15)  The plaintiff's

complaints were never resolved because the CRWDB Employee Complaint

Procedure was never implemented. (Amend. Complaint ¶ 15).   Frank Chiaramonte,

the Executive Director of the CRWDB, would arbitrarily and capriciously handle

plaintiff's grievances and complaints.  (Amend. Complaint ¶ 15)  Plaintiff was forced

to seek redress by informing CRWDB Board Members of the discriminatory and

subjective treatment to which she was being subjected. (Amend. Complaint ¶ 15)

Plaintiff continued to be harassed, abused and stereotyped by the defendant and

others who worked in the same facility as the defendant.  (Amend. Complaint ¶ 16)

In a February 8, 2000, meeting with Defendant Frank Chiaramonte, regarding a

complaint lodged by Plaintiff against co-worker Ted Hale, Finance Officer for the

CRWDB plaintiff asked for written clarification of parking validation procedures for

building tenants whom she was expected to service. (Amend. Complaint ¶ 17).

Plaintiff lodged a discrimination complaint against Ted Hale, for shouting and

swearing at her, stating "I'm not giving you a fucking thing…Just because you don't

like the bitch [Joan Sieverts], I'm not going to do all this shit.  " (Amend. Complaint

¶ 17).  Ted Hale further shouted at plaintiff, stating "I'm not giving you a fucking

thing.  I don't give a shit what you need, I'm not going to do all this shit…if you want

a memo, go to Frank [Chiaramonte]". (Amend. Complaint ¶ 18). Abusive treatment of Plaintiff by Ted Hale, occurred more than once, and was never resolved. (Amend. Complaint ¶ 19). Plaintiff was again forced to make another complaint of discrimination on February 24, 2000.. (Amend. Complaint ¶ 20). In this incident, Plaintiff was asked by Wendy Tortomas, plaintiff's immediate supervisor, to…protect the 'safety and well being of CRWDB employees'. (Amend. Complaint ¶ 21). Wendy Tortomas instructed Plaintiff to look for, and if necessary, hold a Black suspect shown on the Hartford Police Department Wanted Poster, at the reception area, in order to protect the 'safety and well being of CRWDB employees.' (Amend. Complaint ¶ 21) Plaintiff was the only employee expected to stop this black man. Plaintiff believes that she was singled out to stop this Black suspect, because she was Black, and for no other reason. Plaintiff advised Wendy Tortomas, that she considered this not only to be dangerous, but to also be racial profiling. (Amend. Complaint ¶ 22) Plaintiff's March 31, 2000 termination was retaliatory and discriminatory. Similarly situated employees not of plaintiff's same protected class have not been terminated or placed on time sensitive performance improvement plans by defendant, as plaintiff had. (Amend. Complaint ¶ 25).

II.    **ARGUMENT**

A.    **Standard of Review for Summary Judgment**

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law."  The Court must draw all reasonable inferences in the light most favorable to the party opposing the motion, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)

To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party.  So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied.  In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433.

Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution.  R. B. Ventures, Ltd. v.

<u>Shane</u>, 112 F.3d 54, 58-59 (2d Cir. 1997). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986). Thus, '[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" <u>Lazard Freres & Co. v. Protective Life Ins. Co</u>., 108 F.3d 1531, 1535 (2d Cir. 1997). Citing <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

   "[S]ummary judgment...is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent, and subjective feelings and reactions." <u>Suarez v. Dickmont Plastics Corp</u>., 229 Conn. 99, 111, 639 A.2d 507 (1994). "A question of intent raises an issue of material fact, which cannot be decided on a motion for summary judgment." <u>Picataggio v. Romeo</u>, 36 Conn. App. 791, 794, 654 A.2d 382 (1995). When passing upon a motion for summary judgment, the court may not resolve factual disputes or make credibility determinations, even if the case is one which eventually will be tried without a jury. <u>In re Unisys Savings Plan Litigation</u>, 74 F.3d 420 (3d Cir. 1996). Rather, the court must resolve any ambiguities and draw all inferences against the moving party. <u>Appleton v. Board of Education</u>, 254 Conn. 205, 757 A.2d

1059 (2000); Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991).  The evidence of the party against whom summary judgment is sought must be believed.  Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994).  The court must construe the evidence in the light most favorable to the party opposing summary judgment and deny the motion unless no construction of the evidence could support judgment in the plaintiff's favor.  Appleton, supra; Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993); United States v. Certain Funds on Deposit in Scudder Tax Free Investment Account #2505103, 998 F.2d 129 (2d Cir. 1993); Union Pacific Corp. v. United States, 5 F.3d 523, 525 (Fed. Cir. 1993); Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 105 (1994); D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434 (1980); Connell v. Colwell, 214 Conn. 242, 246-47 (1990).

At the summary judgment stage, the Court should not make any finding as to whether [a defendant's] reason was, in fact, false. Rather, the Court must determine whether, after casting all of the facts of the case in the light most favorable to [the plaintiff] and drawing all inferences from those facts in favor of [the plaintiff], a rational jury could come to the conclusion that [the defendant's] justification for [a particular action] is false. Peralta V. Cendant Corp 123 F.Supp.3d 65 (2000) "If, as to the issue on

which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996). In cases where the movant is the defendant, the defendant must demonstrate that the nonmoving party, the plaintiff, lacks evidence to support an essential element of his/her claim. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The burden is "discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id.

Once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. Id. At 325. The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing there is a genuine issue for trial". Id. At 324. "{T}he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986) (emphasis in original)

The ultimate question of fact in an employment discrimination case is "not whether the plaintiff established a prima facie case or demonstrated pretext, but whether

the defendant has discriminated against plaintiff." United States Postal Service Bd. Of

Governors v. Aikens, 460 U.S. 711, 714 (1983)

**B.   Plaintiff Can Make Out a Prima Facie Case of Employment   Discrimination**

   McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) lays out the burden of

production and order of proof analysis for Title VII causes of action and 42 U.S.C. §

1981 causes of action.  "To make out a prima facie case, the plaintiff must show that:  (i)

she is a member of a protected class; (ii) she was qualified for the position; (iii) the

defendant took adverse action against her; and (iv) the adverse action occurred under

circumstances giving rise to an inference of discrimination." Harper v. Metropolitan

District Commission, 134 F. Supp. 2d 479, 483 (D. Conn. 2001) (Covello, C.J.).  Stated

another way, a plaintiff may make out a prima facie case "by showing that she is within a

protected group; that she is qualified for the position; that she was subject to an adverse

employment action...; and that a similarly situated employee not in the relevant protected

group received better treatment." McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir.

2001).  "Alternatively, the fourth prong of the prima facie case may be satisfied if the

plaintiff can demonstrate that the...adverse employment action occurred under

circumstances giving rise to an inference of discrimination on the basis of plaintiff's

membership in that class." Farias v. Instructional Systems, Inc., 259 F.3d 91, 98 (2d Cir. 2001).

"To establish a prima facie case of disparate treatment, a plaintiff must show, inter alia, that she was subjected to adverse employment action, under circumstances giving rise to an inference of prohibited discrimination." Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir. 2001). "In an employment discrimination case, the plaintiff has the burden of 'proving by the preponderance of the evidence a prima facie case of discrimination.'" Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994), quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). A plaintiff need not necessarily prove a prima facie case to prevail, however. "For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." Swierkiewicz v. Sorema N.A., 122 S. Ct. 992, 997 (2002).

Despite defendants' parenthetical comment that the plaintiff has not established a prima facie case of discrimination, the plaintiff has more than established the same. Had the plaintiff not established even a prima facie case, the defendants would have been successful in a motion to dismiss. The defendants concede that the plaintiff is a member of a protected class and that she was subjected to an adverse employment action.

Defendants choose to focus on the third and fourth prong of <u>McDonnell</u>, contending that the plaintiff cannot show that she was doing her job satisfactorily nor that she was fired under circumstances giving rise to an inference of discrimination. The plaintiff's "satisfactory" performance evaluations earned over the course of her years of employment are evidence that she knew her job and had been performing satisfactorily until she began to encounter the discriminatory environment, and in fact, opposed such an environment (Exhibit 3 and Exhibit 9). Furthermore there is more than ample evidence to demonstrate that the plaintiff was terminated under circumstances giving rise to an inference of discrimination. The reasons given for discrimination: poor work performance and insubordination are strictly pretextual. Plaintiff is aware of other similarly situated employees, namely, Mary Ann Mahoney and Amy Holmes, who held the same position as the plaintiff and were treated differently in the terms and conditions of their employment, from plaintiff. Similarly situated White females hired as Administrative Assistants, as plaintiff was, were not required to work for four different agencies whom they were not employed by. (Exhibit 1) These similarly situated individuals were not required to serve as unpaid security staff, nor were they expected to screen security risks identified by the Hartford Police Department, and to possibly place their lives in danger to save and protect CRWDB employees at the expense of their own

safety. (Exhibit 21 and Exhibit 19)  Further, these similarly situated employees were not required to sit in the reception area, providing both security services and receptionist services for the CRWDB employees as well as to serve as assistants to other managers from four agencies that they did not work for. (Exhibit 21)  Mary Ann Mahoney (White female) was hired as an Administrative Assistant  at a higher salary than Plaintiff's and given the position Plaintiff had initially requested.  (Exhibit 1)  Another Administrative Assistant, Amy Holmes (White female) was hired on February 9, 1998, and was paid almost $3000 more than Plaintiff.  (Exhibit 1).  Plaintiff was worked out of her job class, as a receptionist and refused the opportunity to work as an Executive Assistant, because "she was so good at handling the phones." (Exhibit 1)   Plaintiff was expected to work for at least four other agencies as a receptionist (Exhibit 1), and in one instance, plaintiff was expected to provide security surveillance and restraint activities in this position.  (Exhibit 19 and Exhibit 18).  Since 1995 Plaintiff was hired as an Administrative Assistant, however, in 1995 CRWDB assigned Plaintiff to the Reception desk and gave her new position responsibilities as a receptionist for CRWDB and four other agencies, without a pay increase or notice to Plaintiff that she was to work for a total of five companies as a receptionist. (Exhibit 22)  Plaintiff's position responsibilities as Administrative Assistant were changed specifically for Plaintiff, and not for the similarly situated White female

Administrative Assistants.  This was done in a memo sent to Plaintiff, but not to the

White female assistants. (Exhibit 22)  In 1994 Plaintiff was given a position description

for Administrative Assistant.  This position description did not include or reference

receptionist or receptionist duties in the principle responsibilities.  Further, this

description did not state that Plaintiff would be expected or required to work for four

different agencies.  This description further did not require, nor did it reference any

telephone responsibilities for plaintiff.  (Exhibit 5)   In or around 1995, Plaintiff received

a memorandum which altered the terms and conditions of her employment.  This

memorandum altered her original job description, adding new responsibilities.  These

new responsibilities were clearly responsibilities of a receptionist, not an Administrative

Assistant.  This change in the terms and conditions of plaintiff's employment amounted to

an adverse employment action on defendant's part.  Plaintiff was now required to do the

work of four people, sit in a receptionist area, serve as employment security, and be given

orders by any White person who worked for any of the four outside agencies.  (Exhibit

22)  Similarly situated White female Administrative Assistants did  not have their job

descriptions altered in this manner, and they did not receive a status change in their job

duties or an alteration in the terms and conditions of their employment.  (Exhibit 22)

In the case at hand, a reasonable jury may infer discrimination from the evidence and the circumstances of the plaintiff's employment, and of the plaintiff's termination. Plaintiff was hired as an Administrative Assistant, and treated and regarded as a receptionist who was expected to work for at least four other agencies that were not paying her.  Plaintiff was expected to take orders from numerous other individuals,  all white, who expected her to perform receptionist duties for their agencies, and to sit in a location central to all of their agencies so that they could all have access to her services (Exhibit 23).  Plaintiff was required to answer telephones for the four agencies in question, whom she was not employed by, and Plaintiff was further expected to provide security services to the Workforce Development Board when instructed.  Plaintiff was hired by the Workforce Development Board as an Administrative Assistant. (Exhibit 1) Plaintiff was not hired to serve as a receptionist. (Exhibit 1)   After the plaintiff complained of what she reasonably believed to be discriminatory treatment by members of the Workforce Development Board, Frank Chiaramonte retaliated against her, ultimately ending her employment with the CRWDB, based on vague, conflicting and pretextual reasons (Exhibit 24).  Defendant's actions supported more than an inference of discrimination, in that similarly situated White female Administrative Assistants did not have their job descriptions altered in this way, and were not subjected to almost any

White person giving them orders, irrespective as to whether they worked for these individuals or not.  Further, Plaintiff was discriminated against in the terms and conditions of her employment, in that disciplinary actions remained in her personnel file in excess of six months, while Ted Hale, White male, had disciplinary actions removed from his personnel file in six months. (Exhibit 17)  Soon after Plaintiff's opposition to what she reasonably believed to be discriminatory treatment, defendants began a campaign to discredit the plaintiff's work and treat her differently from the way defendant treated other similarly situated White employees who had not complained of discrimination. (Exhibit 23)

Plaintiff was hired as a full-time Administrative Assistant on or about August 15, 1994 at an annual salary of $25,000 and performed the duties of an Executive Assistant. (See Exhibit 1)  The policy of the Capital Region Workforce Development Board was to "promote within when it finds, within its discretion, that current employees are the most qualified for a particular position. (See Exhibit 2)  Plaintiff received a "4" on her Performance Evaluation Form, "4" meaning that Plaintiff 'frequently exceeded' expectations.  Plaintiff's performance evaluation, identified Plaintiff's quality of work and performance as, "highly effective", with successful completion of objective measures and subjective factors that are required to effectively achieve job goals. (See Exhibit 3)

Nevertheless, Plaintiff was discriminated against by Wendy Tortomas, white female, who was hired one year after Plaintiff was employed, to fill the Executive Assistant position which plaintiff was hired to fill, initially. (Exhibit 1)   In further discrimination against Plaintiff, Defendants hired Amy Holmes, a White female, in February of 1998.   Amy Holmes was paid a salary of almost $3,000.00 more than Plaintiff, for the same work. (See Exhibit 4)  In November of 1995, Frank Chiaramonte informed plaintiff that another administrative assistant was to be hired.   At that time, Plaintiff again requested to be moved from the reception area and assigned other duties, preferably financial.  Plaintiff's request was denied, even though she was NOT hired as a receptionist.  The reason given for this change in the terms and conditions of her employment, and a status change to a receptionist, was that "Everybody thinks you're so good with the phones…" (Exhibit 4) "It is the policy of the Capital Region Workforce Development Board to promote from within when it finds, within its discretion, that current employees are the most qualified for a particular position.  Defendants violated their own policy in not considering plaintiff for promotion.  (Exhibit 2)  Plaintiff's duties included answering the telephone, which was noted on her 1995-1996 Performance Evaluation Form, however, no where on this form does it say that plaintiff is to serve as a receptionist for even one agency, let alone four or more agencies. (Exhibit 4)  Plaintiff received a rating of "4" on her Performance

Evaluation Form, meaning that Plaintiff frequently 'exceeded expectations'.   This

Performance Evaluation Form identified Plaintiff's quality of work and performance as,

"highly effective." (Exhibit 3 and 4)  Plaintiff's Position Description states that plaintiff

"Provides Back-up support for other Administrative Assistants and Receptionist as

number "7" in the priority realm of principal responsibilities. (Exhibit 5)  Plaintiff was

being used as a receptionist and Defendants further discriminated against Plaintiff by

allowing outside agencies to use Plaintiff as a receptionist, without her consent, and

without a pay increase.  (Exhibit 7)  Defendant Frank Chiaramonte further discriminated

against Plaintiff by continually referring to plaintiff as a receptionist. (Exhibit 8)  Until

1998, Plaintiff received more than satisfactory performance evaluations from Defendant.

(Exhibit 9)  From that point forward, Plaintiff was further discriminated against based on

the fact that plaintiff did not receive regular Performance Evaluations from management.

(Exhibit 10)  Additionally, Ted Hale, White male co-worker, exhibited rude, offensive,

harassing, inappropriate and disrespectful behavior towards Plaintiff'.   Ted Hale was not

terminated for this behavior, and ultimately, plaintiff was terminated for complaining

about Mr. Hale's abusive and inappropriate treatment of her.  This incident took place

between Ted Hale and plaintiff, on or about February 2, 2000. (Exhibit 12)  Although Mr.

Hale admitted to inappropriate and disrespectful behavior towards Plaintiff like slamming

papers down on the floor, screaming and swearing, (Exhibit 13), Plaintiff was discriminated against again, when "Frank Chiaramonte held Ms. Moore **'partially responsible'** for the situation between the two of them." (Exhibit 14)

Plaintiff contends that the matter was not handled fairly and that she was further discriminated against, as Frank Chiaramonte did not speak to Plaintiff after she filed her complaint against Ted Hale. (Exhibit 15)    In fact, Frank Chiaramonte blamed Plaintiff, in part, for the dispute with Ted Hale. (Exhibit 15)   After the dispute, Chiaramonte, advised plaintiff "If I were you, I'd look for another job." (Exhibit 16)

Plaintiff was disciplined more harshly.  Ted Hale was not disciplined for his profanity and throwing of papers. Hale was given a reprimand and was not terminated for his inappropriate, unprofessional discriminatory actions against Plaintiff.  In fact, Ted Hale's behavior was considered by Chiaramonte, to be an "isolated situation" and no further action was necessary.  Also, the memo regarding discrimination against Plaintiff, was removed from Ted Hale's file after six months. (Exhibit 17)  Disciplinary actions against the plaintiff, no matter how minor, have been permanently maintained in plaintiff's personnel file.  Clearly a White male, who yelled at and swore at a Black female, was treated in a far more favorable manner relative to disciplinary actions taken.  These types of actions relative to removing disciplinary actions from a White person's personnel file

after six months, and leaving disciplinary actions in a Black female's personnel file, result in the CRWDB being able to terminate plaintiff at any point in time.  This arbitrary treatment of disciplinary actions relative to White males and Black females within the CRWDB, is in fact discriminatory.

The next incident of direct discrimination against plaintiff, occurred when Plaintiff, a Black female, was given a "poster" of a very dark skinned black man, which was allegedly posted to local businesses by the Hartford Police Department.  Plaintiff was instructed by her White female supervisor, Wendy Tortomas, to "hold" this known criminal, a Black man, and not let him gain entry to the inside of the facility, where CRWDB employees worked.  When the Plaintiff objected to stopping a Black man, whom she could not identify from the picture sent out by the Hartford Police Department, the defendant, through its agent, Wendy Tortomas, stated that Plaintiff's response was 'inappropriate' and that "the person posted on this flyer could have been a potential threat to the safety and well being of CRWDB employees. (See Exhibit 18)  Plaintiff was discriminated against as she, a Black female, was expected to be the person to "hold" this Black man portrayed on the Hartford Police Department poster, "deny access and call security", thus putting her life in danger to save and protect CRWDB employees. (See Exhibit 19)  Plaintiff, an African-American Black female, was the only employee asked

to perform this dangerous security task.  The race of the individual depicted on the Hartford Police Department bulletin, was Black, and the plaintiff is Black.  Plaintiff complained of this blatant and direct discrimination to her immediate supervisor, Wendy Tortomas.   Plaintiff did not receive any assistance when it came to security issues.  She was ignored. (Exhibit 20)  The question here, is why plaintiff was the only person asked to "hold" the Black man on the Hartford Police Department flyer.  There is no legitimate business reason for plaintiff being required to engage in such a risky venture, other than her race (Black) was the same race of the individual depicted in the police poster (Black). Plaintiff had no special security training (Exhibit 20); plaintiff was not hired to provide security services (Exhibit 1; Exhibit 20 and Exhibit 22) plaintiff did not know this individual; and plaintiff possessed no special qualities to perform this task (Exhibit 20), other than the color of her skin.

Plaintiff, although hired as an administrative assistant, was placed in the position where the receptionist sat, and plaintiff was expected to provide both security services and receptionist services for CRWDB employees, as well as free receptionist services and security services for other White managers from four other agencies that plaintiff did not work for. (See Exhibit 21 and Exhibit 23)   Defendant further discriminated against Plaintiff in the terms and conditions of her employment, by arbitrarily changing the title,

status and job duties of plaintiff's Administrative Assistant position to that of receptionist/security guard and all around 'Girl Friday' for agencies plaintiff was never even hired to work for.  Plaintiff was not monetarily compensated for these additional duties. (See Exhibit 22)   This arbitrary change in the terms and conditions of her employment amounts to discriminatory treatment, as similarly situated White female Administrative Assistants did not have their job duties and job descriptions altered.  This is an adverse employment action, with an inference of discrimination.   Although Plaintiff on numerous occasions complained about the hostile work environment and the unfair treatment by others, Plaintiff was denied due process and put on written warning with possible termination in thirty days, following her opposing what she reasonably believed to be discriminatory treatment based on her race. (See Exhibit 23) (Exhibit 25 p. 12 -16) Based on the closeness in time of this written warning relative to plaintiff complaining of and opposing what she reason ably believed to be illegal discrimination, plaintiff was *retaliated* against.  Further, plaintiff was denied due process in the termination process as well.  Impossible terms and conditions were imposed on plaintiff in a thirty day written warning by Defendant Chiaramonte.  Plaintiff was instructed to "stay at her desk" in a job that required her to make copies, and work provide assistance to others, which required plaintiff's walking to the offices of other individuals in the agency in order to do her job.

In this case, a thirty day review as to whether she remained in her seat for thirty days, was designed for plaintiff to fail.  (Exhibit 23)   This impossible directive by Frank Chiaramonte, contained in this 30 day written warning, clearly indicates that plaintiff's termination was pretextual, and in retaliation for plaintiff bringing charges against Ted Hale, White male co-worker.  In fact, before the thirty days had expired, Defendant Frank Chiaramonte terminated Plaintiff, thus denying her due process, and more importantly, retaliating against plaintiff for opposing what she reasonably believed to be discrimination in the workplace.  (Exhibit 24)  On or around March 31, 2000, there was a decision by Defendant Chiaramonte, to terminate plaintiff.   The specific reasons given in this letter of termination, are as follows, "[u]nfortunately, I have not witnessed any improvement in her [plaintiff's] performance during the past thirty days.  In particular, she [plaintiff] has refused to follow instructions from her immediate supervisor, Wendy Tortomas, and has been insubordinate.  Also there have been complaints regarding her attitude and lack of cooperation.   In addition, she has made a number of habitual fundamental mistakes in her job performance.   In summary, Diane's performance falls short of what is acceptable for an employee of this organization." (Exhibit 24)  This letter of termination juxtaposed between plaintiff's two employee performance evaluations that rank plaintiff as consistently "exceeding standards" brings to light the fact that there was

something wrong with the reasons proffered for plaintiff's termination.  (Exhibits 3, 9 and 24)

"The plaintiff's burden of establishing a prima facie case of employment discrimination is 'not onerous.'  Burdine, 450 U.S. at 253.  Indeed, "[t]he nature of the plaintiff's burden of proof is de minimis."  Harper v. Metropolitan District Commission, 134 F. Supp. 2d 470, 483 (D. Conn. 2001) (Covello, C.J.), citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988).  "As we have often emphasized, the burden of establishing this prima facie case in employment discrimination cases is 'minimal.'"  McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).  Direct evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence.  See Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) ('An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent.')."  Luciano v. Olsten Corp., 110 F.3d 210, 215 (2d Cir. 1997).  Often, "[w]hat is most revealing of the true intention behind the [adverse employment action] is the timing."  Harper v. Metropolitan District Commission, 134 F. Supp. 2d 470, 489 (D. Conn. 2001) (Covello, C.J.).

Defendants do not dispute that plaintiff meets the first prong of the <u>McDonnell Douglas Corp. v. Green,</u> 411 U.S. 792 (1973) burden of production.  Defendants do not dispute that plaintiff is an African-American female, a member of a protected class; plaintiff meets the second prong of the <u>McDonnell</u> test, in that plaintiff was qualified for the position.  Plaintiff was hired and successfully worked as an Administrative Assistant, obtaining a more than satisfactory performance evaluation on or around 8/15/95 to 8/16/96 (Exhibit 3) and on or around 9/3/96 to 8/17/97 (Exhibit 9).  Defendants do not dispute that plaintiff was hired as a full-time administrative assistant in August, 1994 at $25,000 and performed the duties of an executive assistant. (Exhibit 1)  Defendants do not dispute that plaintiff meets the third prong of the <u>McDonnell</u> test, in that defendants took an adverse employment action against plaintiff, who was terminated from employment with defendant on or around March 31, 2000. (Exhibit 27)  Relative to the fourth prong of <u>McDonnell,</u> defendants dispute that plaintiff's termination occurred under circumstances giving rise to an inference of discrimination, however, plaintiff was treated differently than similarly situated Administrative Assistants hired by the CRWDB, in that even though it was the policy of the CRWDB to "'promote within…when it finds, the current employees are the most qualified for a particular position." (Exhibit 2)  Plaintiff complained about having to work for four other agencies that were not paying her, and

having to be supervised and disciplined by White persons who were employed by these agencies.  Plaintiff complained to Frank Chiaramonte about the how she was treated by other people not in the suite, not only some of the CRWDB employees, but employees from the other four agencies that were in the suite.  Plaintiff complained that "It seemed that everyone was allowed to tell me what to do." (Exhibit 23)  In addition, plaintiff stated that the treatment she received from some members of the other agencies and also some from the Workforce Development Board employees was discriminatory because whenever it was mentioned to Chiaramonte or Tortomas, nothing was done.  In other words, "White people could treat me [plaintiff] any way they wanted."  When plaintiff would respond, she was the one that was chastised or reprimanded.   (Exhibit 23).  Plaintiff was being used as a receptionist instead of working in the position of Administrative Assistant, for which she was hired, and Defendants further discriminated against Plaintiff by allowing **four** other agencies to use Plaintiff as a receptionist without monetary restitution, and without her consent.  (Exhibit 7)  Plaintiff was hired as a full-time Administrative Assistant on August 15, 1994.  (Exhibit 1)  Defendant Frank Chiaramonte further discriminated against plaintiff by continually referring to her as a receptionist, and using her for that purpose, working her outside of her job description.  (Exhibit 8 and Exhibit 5)  Plaintiff was subjected to inappropriate and disrespectful

behavior by White employees, such as slamming papers down on the floor where plaintiff worked; screaming and swearing.  When plaintiff complained to White male Executive Director, Frank Chiaramonte, he refused to speak to her for two weeks, and at a meeting called by Frank Chiaramonte on February 8, 2000, she was told to "start looking for another job". (Exhibit 13 and Amend. Complaint ¶ 14)  Ted Hale, the employee who **told** plaintiff "I don't give a shit about what you need, I'm not giving you a fucking thing, if you need a memo, go to Frank Chiaramonte," was *not* placed on a 30 day probation, and then terminated. (Exhibit 13).  The only legitimate difference between plaintiff and Ted Hale, is that plaintiff is Black and Ted Hale is White.  There was no legitimate business reason to terminate plaintiff for complaining about what she reasonably believed to be discriminatory treatment on the part of Ted Hale.  Further, defendants continuously used disciplinary actions and written warnings from plaintiff's personnel file that were older than six months old.

When Ted Hale was written up by Frank Chiaramonte for shouting and swearing at plaintiff, Frank Chiaramonte  stated in a memorandum dated February 16, 2000, that "This memo will be removed from Ted's file in six months." (Exhibit 17)  Plaintiff was treated differently than White male Ted Hale, who had disciplinary actions removed from his personnel file after six months.   Plaintiff, on the other hand, had disciplinary

documents placed in her file from the beginning of her employment in 1994 until she was terminated in 2000, and these same documents were used to support her termination, six years later. ( Exhibit 25 p. 3, 4, 5 and 6), all of these incidents should have been removed from her personnel file, and should never have been used to support or defend plaintiff's termination, as all of the prior exhibits were actions, incidents or notes, which were retained in plaintiff's personnel file for more than six months.   The above exhibits, presented by defendants, all occurred between March 1996 and July 1999.  These alleged disciplinary notes in plaintiff's personnel file were certainly too remote in time to even justify maintaining them in her personnel file, years later, when far more serious incidents, such as the incident where White male Ted Hale shouted and swore at plaintiff, were removed by White male Frank Chiaramonte after six months, when the incidents in question were against the Black female plaintiff.   These disciplinary actions against plaintiff remained in her personnel file until she was terminated from employment on or around March 31, 2000.  (Exhibit 25 p. 3)

The policy of the Capital Region Workforce Development Board was to "promote within when it finds, within its discretion, that current employees are the most qualified for a particular position. (See Exhibit 2)  Plaintiff received a ranking of "4" on her Performance Evaluation Form, "4" meaning that Plaintiff frequently exceeded

expectations.  Plaintiff's Performance Evaluation Form identified Plaintiff's quality of work and job performance as "highly effective and successful completion of objective measures and subjective factors that are required to effectively achieve job goals." (Exhibit 3 and Exhibit 9)

It is not credible to believe that that an employee who received these types of ratings and comments on both Performance Evaluation Forms, would have been denied an employment promotion to Executive Assistant, or that this same employee, could have become an employee whose skills now became not only questionable, but terminable, within a few short months. (Exhibit 25 p. 14)  Plaintiff's termination of her employment simply had to be something other than what defendants state--poor job performance. (Exhibit 25 p. 3 - 14)  Defendant's reason for plaintiff's termination as poor performance is not believable, and it is simply not true, based on the facts presented.  It is plaintiff's contention that defendants are attempting to cover up an illegal discriminatory motive for plaintiff's termination, based on the facts and evidence presented above.

Additionally, plaintiff made it very clear that she was looking to advance her career with CRWDB and specifically asked for a promotion to the position of Executive Assistant. (See Exhibit 4)  Plaintiff was not only denied this promotion, plaintiff was for all effective purposes, demoted to the position of receptionist, working for four additional

agencies with no increase in pay, and with many more supervisors and far more responsibilities.  Other White, female executive Assistants were hired at higher salaries than plaintiff's. (Exhibit 1)

**C.** **Plaintiff Can Show That Defendant's Legitimate Reason for Termination is a Pretext for Discrimination and that it was Retaliatory**

Title VII provides that it is an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation, plaintiff must show (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action subsequent thereto; and (3) that a causal connection exists between his participation in the protected activity and the adverse employment action. Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir.1998)

The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus. DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir.), cert. denied 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395

(1987); Grant v. Bethlehem Steel, 622 F.2d 43, 46 (2d Cir. 1980). Title VII is violated if

a retaliatory motive played a part in the adverse employment actions even if it was not the

sole cause, Davis v. State University of New York, 802 F.2d 638, 642 (2d Cir. 1986), and

if the employer was motivated by retaliatory animus. Title VII is violated even if there

were objectively valid grounds for the discharge. DeCintio, 821 F.2d at 116, n. 8.

     The employer may seek to rebut the prima facie case by proof of a legitimate

nondiscriminatory reason for the adverse employment action.  If the plaintiff is able to

persuade the jury that the employer's explanation is false, however, that fact, combined

with the prima facie case, is sufficient to permit a jury to find intentional discrimination.

"Proof that the defendant's explanation is unworthy of credence is...one form of

circumstantial evidence that is probative of intentional discrimination, and it may be quite

persuasive.  In appropriate circumstances, the trier of fact can reasonably infer from the

falsity of the explanation that the employer is dissembling to cover up a discriminatory

purpose.  Such an inference is consistent with the general principle of evidence law that

the factfinder is entitled to consider a party's dishonesty about a material fact as

'affirmative evidence of guilt.'"  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S.

133, 120 S. Ct. 2097, 108 (2000), quoting Wright v. West, 505 U.S. 277, 296 (1992).

"The factfinder's disbelief of the reasons put forward by the defendant (particularly if

disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proferred reasons will permit...the trier of fact to infer the ultimate fact of intentional discrimination...[and] no additional proof of discrimination is required."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).  "[O]nly occasionally will a prima facie case plus pretext fall short of the burden a plaintiff carries to reach a jury on the ultimate question of discrimination...."  Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 94 (2d Cir. 2001).

In the case at bar, plaintiff was subjected to inappropriate harassment based on her race, and disrespectful behavior by White employees slamming papers down on the floor where plaintiff worked; screaming and swearing at plaintiff.  When *plaintiff complained to White male Executive Director, Frank Chiaramonte, he refused to speak to her for two weeks,* and at a meeting called by Frank Chiaramonte on February 8, 2000, *plaintiff was told to "start looking for another job"*. (Exhibit 13 and Amend. Complaint ¶ 14) Ted Hale, the employee who *told* plaintiff "I don't give a shit about what you need, I'm not giving you a fucking thing, if you need a memo, go to Frank Chiaramonte," was *not* placed on a 30 day probation, and then terminated, plaintiff was, immediately following her complaint against Ted Hale for his abuse and harassment of her. (Exhibit 13).  The

only legitimate difference between plaintiff and Ted Hale, is that plaintiff is Black and Ted Hale is White.  There was no legitimate business reason to terminate plaintiff for complaining about what she reasonably believed to be discriminatory treatment on the part of Ted Hale.  Further, defendants continuously used disciplinary actions and written warnings from plaintiff's personnel file that were older than six months old.  When Ted Hale was written up by Frank Chiaramonte for shouting and swearing at plaintiff, Frank Chiaramonte  stated in a memorandum dated February 16, 2000, that "This memo will be removed from Ted's file in six months." (Exhibit 17)  Plaintiff was treated differently than White male Ted Hale, who had disciplinary actions removed from his personnel file after six months.  Plaintiff, on the other hand, had disciplinary documents placed in her file from the beginning of her employment in 1994 until she was terminated in 2000, and these same documents were used to support her termination, six years later. (See Exhibit 25 p. 3 - 6) all of these incidents should have been removed from her personnel file, and should never have been used to support or defend plaintiff's termination, as all of the prior exhibits were actions, incidents or notes, which were retained in plaintiff's personnel file for more than six months.  The above exhibits, presented by defendants, all occurred between March, 1996 and July 1999.  These alleged disciplinary notes in plaintiff's personnel file were certainly too remote in time to even justify maintaining

them in her personnel file, years later, when far more serious incidents, such as the incident where White male Ted Hale shouted and swore at plaintiff, were removed by White male Frank Chiaramonte after six months, when the incidents in question were against the Black female plaintiff.  These disciplinary actions against plaintiff, remained in her personnel file until she was terminated from her employment on or around March 31, 2000.  (Exhibit 25 Exhibit 27)

## III.  CONCLUSION

Clearly, the reasons for plaintiff's termination were false and pretextual.  There was no legitimate business reason for terminating plaintiff, other than she complained about and opposed discriminatory treatment in the workplace.  Plaintiff wrote a letter to Frank Chiaramonte on or about February 2, 2000 complaining about Ted Hale, a co-worker throwing things, shouting and swearing at her.  On or around March 2, 2000, Frank Chiaramonte issued plaintiff a written warning (Exhibit 25 Exhibit 26).  On or around March 31, 2000, plaintiff was terminated by Frank Chiaramonte.  Plaintiff was terminated from the CRWDB, within two months of opposing what she believed to be discriminatory conduct on the part of Ted Hale.  Ted Hale was not disciplined for his actions, and he maintained his job, and had the complaint lodged by plaintiff, removed from his personnel file within six months of her bringing a complaint of what she

reasonably believed to be discriminatory treatment against her in the workplace.  In addition, plaintiff opposed providing receptionist services for four agencies that she was not hired to work for.  Plaintiff further opposed taking orders from any White person who chose to give them to her.  Plaintiff additionally complained to CRWDB management about what she believed to be employment discrimination when she was reprimanded by White managers and employees from other companies, who felt free to file complaints against her if she did not do their bidding.     Plaintiff further opposed the fact that similarly situated White CRWDB Administrative Assistants were not required to work outside of their job description as she was.  Plaintiff was hired as an Administrative Assistant, and reclassified without due process, to the position of receptionist.  Plaintiff was faced with an extremely hostile work environment, based on her race, in that she was required to take orders from any White person who chose to give them to her, whether they worked for the CRWDB or not; that she [plaintiff] was reprimanded and/or disciplined if she did not do the work for White managers and employees outside of the CRWDB, by her employer; that she [plaintiff] was sworn at, yelled at on the job, harassed based on her race and intimidated, and that those individuals engaging in this type of conduct, were not terminated, while she was.  Plaintiff also opposed being placed in the position of having to provide security services and protection to CRWDB

employees relative to a poster circulated by the Hartford Police Department, portraying a Black man whom she did not know, and whom she could not identify from a dark picture on a police warning poster.  Plaintiff was expected "hold" a Black police suspect, and to effectively risk her own safety in order to protect CRWDB employees. The Defendants reasons for plaintiff's termination were clearly pretextual, and the circumstances surrounding her termination, were pretextual.  Plaintiff was ***retaliated*** against for filing a complaint against White, male co-worker, Ted Hale.   Defendant had no legitimate business reason to terminate plaintiff, other than she opposed what she reasonably believed to be discrimination based on the different treatment she received throughout the entire course of her employment.   Plaintiff had excellent performance evaluations. Plaintiff opposed being paid almost $3000 less a year than a similarly situated white female Administrative Assistant, for the same job.  Plaintiff was terminated when she complained about Ted Hale's shouting and swearing at her [plaintiff], and throwing papers during a discussion she had with him in the office.   Ted Hale, a white male, was not terminated for shouting and swearing at plaintiff, however, plaintiff was terminated on March 2, 2000 after she complained on February 8, 2000 about white male co-worker, Ted Hale, for shouting and swearing at her and throwing papers in the office during a discussion with plaintiff.  The time frame between plaintiff's complaints of discrimination

against Ted Hale, and her termination, clearly supports the fact that plaintiff was retaliated against for opposing what she reasonably believed to be discriminatory treatment in the workplace, and the conduct of the White employee whom plaintiff complained to the Executive Director about, relative to plaintiff, clearly support the charge of a hostile work environment, based on plaintiff's race.  Based on the facts surrounding plaintiff's termination, and based on plaintiff's excellent employment evaluations, it is apparent that Frank Chiaramonte terminated plaintiff's employment in retaliation for plaintiff opposing discriminatory treatment in the workplace on or around February 2, 2000, and that plaintiff was terminated for false and pretextual reasons less than two months later, on March 31, 2000.     All of plaintiff's performance evaluations reflected a rating of satisfactory or above.  Had plaintiff been a poor employee, her employee performance evaluations would have reflected this.  The plaintiff filed a CHRO complaint against the Capitol Region Workforce Development Board, and brought this subsequent action against the defendants, in U. S. District Court.  For all of the reasons stated above, the plaintiff respectfully request that Defendant's Motion for Summary Judgment be denied.

FOR THE PLAINTIFF


BY:_____

        Cynthia R. Jennings
        THE BARRISTER LAW GROUP, LLC
        211 State Street
        Bridgeport, CT 06604
        Tel:  203-334-4800
        Fax:  203-333-7178


## CERTIFICATION  OF  SERVICE


On November 1, 2004 copies of Plaintiff's Opposition to Defendant's Motion for
Summary Judgment, were mailed to:

Thompson G. Page
THOMPSON GOULD PAGE, LLC
The Richardson Suite 300
942 Main Street
Hartford, CT 06103-1221


By_____

        Cynthia R. Jennings, Esq.